UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **KINSALE INSURANCE COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 6:19-cv-00413-JCB** |
| | § | |
| **ETOPSI OIL & GAS LLC dba EAST** | § | |
| **TEXAS OILFIELD PRODUCTIONS** | § | |
| **SVC, INC. and MCBRIDE** | § | |
| **OPERATING, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**KINSALE INSURANCE COMPANY'S MOTION FOR FINAL
SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Kinsale Insurance Company ("Kinsale"), pursuant to Fed. R. Civ. P. 56, moves for final

summary judgment against ETOPSI Oil & Gas LLC ("ETOPSI") and McBride Operating, LLC

("McBride"), and states:

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

STATEMENT OF THE ISSUES..........................................................................2

SUMMARY JUDGMENT EVIDENCE ...............................................................2

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................3

    McBride's Pre-Petition Demand.................................................................3

    McBride's Original Petition.......................................................................3

    McBride's Amended Petition .....................................................................4

    The Kinsale Surplus Lines CGL Policy .....................................................4

    This Coverage Action ...............................................................................6

ARGUMENT AND CITATION OF AUTHORITY ..............................................7

    *Summary Judgment Standard* ..................................................................7

    *Choice of Law* ........................................................................................7

    *Insurance Policy Interpretation Principles* .............................................8

    *Duty to Defend Standard* .......................................................................8

I.     THERE IS NO "PROPERTY DAMAGE"...................................................9

    A.  McBride's Petition Seeks Purely Economic Damages .............................9

    B.  There Was No "Loss of Use" Because the
         Injection Well Never Previously Existed................................................11

II.    THE PROFESSIONAL LIABILITY EXCLUSION PRECLUDES
      COVERAGE ..........................................................................................12

    A.  McBride Admits it Sued ETOPSI for Professional Services..................13

    B.  ETOPSI Provided McBride with Professional Services ........................17

III.   THE POLICY'S J.(5) AND J.(6) EXCLUSIONS BAR COVERAGE ........19

**IV.**     **BECAUSE KINSALE HAS NO DUTY TO DEFEND, THERE IS NO DUTY TO INDEMNIFY** ........................................................................22

**V.**     **THERE ARE NO APPLICABLE AFFIRMATIVE DEFENSES** .............................23

**VI.**     **ETOPSI IS NOT ENTITLED TO DAMAGES UNDER CHAPTER 542** ..................24

**CONCLUSION** ........................................................................................................24

**CERTIFICATE OF SERVICE** ................................................................................25

## <u>INTRODUCTION</u>

The issues in this action are straightforward. Essentially, ETOPSI was hired by McBride as a consultant to design and supervise the construction of a new, injection well in Rusk County, Texas. ETOPSI determined the appropriate total depth of the hole, drilled down to that depth, and then cemented the casing into place. It was later determined that the hole was not deep enough. The depth was at least 200 feet shorter than necessary to reach the desired geological formation. Stated as simply as possible, the injection well did not function as it was intended. McBride attempted to rework the well to a deeper depth, but that proved unsuccessful. As a result, McBride was forced to rebuild a new, second injection well. McBride has now sued ETOPSI, claiming it has incurred over $1.7 Million in expenses to correct ETOPSI's work and rebuild the second well.

Kinsale insured ETOPSI under a commercial general liability policy, not a professional liability policy and not a performance bond for faulty work. As more fully explained below, ETOPSI was sued for economic damages for building a new, functioning well. ETOPSI was not sued for "**property damage**," which is required for coverage under the policy's Insuring Agreement. Moreover, in acting as a consultant that designed the injection well, ETOPSI was providing professional services, which are excluded under the **Professional Liability Exclusion**. Indeed, McBride, the plaintiff in the underlying action, admitted in its answer that ETOPSI was providing it with professional services. Last, to the extent ETOPSI was responsible for providing a functioning injection well and failed to do so, there is also no coverage under the **Damage to Property Exclusion**. As decided by the Fifth Circuit and numerous other district courts applying Texas law, Kinsale is entitled to summary judgment as a matter of law.

## STATEMENT OF THE ISSUES

1.      Whether Kinsale has a duty to defend ETOPSI; more specifically:

   a.   Whether there is "property damage" under the Insuring Agreement?

   b.   Whether the Professional Liability Exclusion precludes coverage?

   c.   Whether the Damage to Property Exclusion precludes coverage?

   d.   Whether the Duty to Defend Exclusion precludes coverage?

2.      If the Court rules that Kinsale has no duty to defend, whether Kinsale has a duty to indemnify?

3.      If there is no coverage, whether Kinsale has liability under the Texas Insurance Code's Prompt Payment Act (Chapter 542)?

## SUMMARY JUDGMENT EVIDENCE

In addition to the pleadings, Kinsale relies on the following summary judgment evidence filed contemporaneously with this motion:[1]

| Exhibit | Description |
| --- | --- |
| A. | McBride's Pre-Petition Demand |
| B. | McBride's Original Petition |
| C. | Kinsale's Denial Letter |
| D. | McBride's Second Amended Petition |
| E. | Composite of Kinsale Policy Declaration Pages |
| F. | The Applicable Kinsale Policy |
| G. | McBride's Initial Disclosures |
| H. | Declaration of J. Daniel Arthur, P.E., SPEC |

---

[1] Pursuant to Local Rule CV-56(d), the cited portions of the attached exhibits are highlighted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

McBride's Pre-Petition Demand

1.      Before filing suit, McBride's counsel sent a demand letter to Kinsale. He alleged McBride was hired to supervise the drilling of a new injection well, but that the casing was too shallow. He threatened economic damages of approximately $1,800,000 to correct McBride's error. (Ex. A.)

McBride's Original Petition

2.      On 7/9/2018, McBride filed suit against ETOPSI in the District Court for Rusk County, Texas, Cause No. 2018-175, for consulting services in connection with a well drilling project ("Underlying Action"). (Ex. B.)

3.      The original petition alleged McBride owned "McBride #1." (*Id.*, Pg. 5, ¶5.) McBride hired ETOPSI as the "drilling consultant," and that "ETOPSI was in control of the drilling operation." (*Id.*; *see also*, DE 5, ¶11, McBride's judicial admission it "hired" ETOPSI.)

4.      McBride alleged that "on or about October 24, 2017, [ETOPSI] completed the drilling on the McBride #1." (Ex. B, ¶5.)

5.      According to McBride, the problem was that "the casing was not set deep enough to reach the Woodbine."[2] (*Id.*)

6.      As a result of ETOPSI's errors, McBride "incurred damages in correcting the problem created by [ETOPSI]." (*Id.*)

---

[2] The "Woodbine" consists of geological formations in east Texas that have been "tremendous oil and gas producers since the 1970s." (*See* M. Dokur and T.F. Hentz, Reservoirs Characterization of the Upper Cretaceous Woodbine Group in Northeast Texas Field, Texas, American Assoc. of Petroleum Geologists, Search and Discovery Article #10331 (2011), available at http://www.searchanddiscovery.com/documents/2011/10331bunge/ndx_bunge.pdf (last visited May 10, 2020).)

McBride's Amended Petition

7.       On 7/30/2018, Kinsale disclaimed coverage. (Ex. C.) Among others, Kinsale denied coverage because McBride claimed damages for repairing and replacing ETOPSI's faulty work. (*Id.*, Pgs. 4, 6.)

8.       After receiving a copy of Kinsale's disclaimer, on 3/12/2019, McBride filed a Second Amended Petition. (Ex. D.)

9.       The pleading alleges that on 10/25/2017, ETOPSI, "as the oil and gas industry consultant, decided that the drilling was complete." (Ex. D, Pg. 3, ¶5.)

10.      It alleges that ETOPSI "designed the injection well" for McBride.[3] (*Id.*)

11.      Further, it alleges ETOPSI "engaged the drilling contractor," "consulted with and advised the owner [McBride] and the drilling contractor," "decided the total depth of the hole," "decided on how deep to set the casing," and "was in control of the drilling operation." (*Id.*)

12.      Alternatively, like the original petition, McBride alleges the "the work or product of [ETOPSI] failed to fulfill the terms of the contract or agreement between [McBride] and [ETOPSI] and [ETOPSI]'s work product." (*Id.*)

The Kinsale Surplus Lines Policy

13.      ETOPSI could not obtain coverage from an admitted insurance company. Consequently, ETOPSI had no alternative but to pursue insurance through the surplus lines market. Unlike admitted insurers, surplus lines insurers provide more strict coverage because

---

[3] An "injection well inject[s] fluids into a reservoir for the purpose of enhanced oil recovery from the reservoir." (*See* Railroad Commission of Texas, INJECTION AND DISPOSAL WELLS, available at https://www.rrc.state.tx.us/about-us/resource-center/faqs/oil-gas-faqs/faq-injection-and-disposal-wells/ (last visited May 10, 2020).)

they do not have their forms approved by the Texas Department of Insurance.[4] *See* Tex. Ins. C. 981.004(a).

14.     On 1/23/2015, Kinsale issued a Policy to ETOPSI, which was renewed three more times. Every policy included the same relevant forms, including the Professional Liability Exclusion. (Ex. E.)

15.     Pertinent to this action is Policy No. 0100026163-2, which was effective for the period from 1/23/2017 to 1/23/2018. (Ex. F.)

16.     The Policy includes these provisions:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      Insuring Agreement**

    **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. …

**2.      Exclusions**

This insurance does not apply to: …

    **j.      Damage To Property**

      "Property damage" to: …

      **(5)**     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or …

---

[4] For general background information regarding surplus lines insurance, *see* SURPLUS LINES INSURERS, https://www.tdi.texas.gov/insurer/surpluslines.html (last visited May 10, 2020).

> **(6)** That particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it. …
>
> Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

(Ex. E, Pgs. 6, 9.)

17.     In addition, the Policy contains an Additional Policy Exclusions endorsement (Form CAS3043 0117), which provides as follows:

### DUTY TO DEFEND EXCLUSION

Where there is no coverage under this policy, there is no duty to defend.

### PROFESSIONAL LIABILITY EXCLUSION

This insurance does not apply to professional liability, malpractice, errors, or omissions or acts of any type including rendering or failure to render any type of professional service nor to any expenses or any obligation to share damages with or repay anyone else who must pay damages from same, unless such Professional Liability coverage is specifically endorsed onto this policy.

(Ex. E, Pg. 47.) ETOPSI did not ever purchase Professional Liability coverage from Kinsale.

D.     <u>This Coverage Action</u>

18.     Kinsale seeks a declaration that it has no duty to defend or indemnify ETOPSI in the Underlying Action. *First*, the Underlying Action contains no factual allegations of "property damage" to satisfy the Insuring Agreement. This is a breach of contract action for economic damages. *Second*, the underlying claims are expressly excluded by the broad Professional Liability Exclusion. *Third*, various exclusions known as "business risk" exclusions apply; they are specifically designed to preclude coverage for faulty work that needs to be corrected. (DE 1.)

19.     McBride claims its economic damages are $1,714,287.59. (Ex. G, Pg. 4.)

20.     In its answer to Kinsale's complaint, **McBride even admitted that ETOPSI "provided McBride with professional services."** (DE 12, ¶12, bold added.)

21.     Moreover, Kinsale retained a notable petroleum engineering expert, J. Daniel Arthur, P.E.. (Ex. H.) Mr. Arthur agrees with McBride and concludes that all the oil consulting services that form the basis of the Underlying Action "involve specialized oil and gas consulting services, and each of these tasks required ETOPSI's specialized skill, training, and experience." (Ex. H, Pg. 3, ¶11.)

## ARGUMENT AND CITATION OF AUTHORITY

### Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is required when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Because an insurer's duty to defend is a "question of law" for the Court, it is appropriate for resolution by summary judgment. *Ooida Risk Retention Group, Inc. v. Williams*, 579 F.3d 469, 471-72 (5th Cir. 2009) (applying Texas law).

### Choice of Law

Where federal court jurisdiction is based on diversity, federal courts follow the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Texas follows the "most significant relationship to the particular substantive issue" test when there is an actual conflict. *See Reddy Ice v. Travelers Lloyds Ins.*, 145 S.W.3d 337, 340 (Tex. App. 2004). In this action, there is no conflict of law. In addition, the policy was issued and delivered to ETOPSI in Texas, ETOPSI's business is located in Texas, McBride is located in Texas, and the underlying incident occurred in Texas. *See also* Tex. Ins. Code Art. 21.42. Accordingly, Texas law applies.

**Insurance Policy Interpretation Principles**

Under Texas law, the bedrock principle of insurance law is that an insurance contract is interpreted "in accordance with the plain meaning of its terms." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892 (Tex. 2017). For this reason, a court's inquiry always begins with "the language of the policy because we presume parties intend what the words of their contract say." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). In the absence of any ambiguity, courts should simply apply the plain language of the policy that the insured purchased. *Certain Underwriters at Lloyd's London v. C.A. Turner Const. Co. Inc.*, 112 F.3d 184, 186 (5th Cir. 1997) ("Under Texas rules of contractual interpretation, if an insurance contract is expressed in unambiguous language, its terms will be given their plain meaning and it will be enforced as written."). In applying this rule, a court "may neither rewrite the contract nor add to its language." *Colony Ins. Co. v. Custom Ag Comms., LLC*, 272 F. Supp. 3d 948, 957 (E.D. Tex 2017) (quoting *Am. Mfrs. Mut. Ins. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)).

**Duty to Defend Standard**

Generally speaking, for the duty to defend, Texas follows the "eight-corners" rule. *Loya Ins. Co. v. Avalos*, --- S.W.3d ---, 2020 WL 2089752 (Tex. 2020). Under this test, "only the four corners of the policy and the four corners of the petition against the insured are relevant in deciding whether the duty applies." *Id.* The court must focus on the "factual allegations," and "not on the legal theories asserted." *Nat. Union Fire Ins. Co. of Pittsburgh v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 142 (Tex. 1997). If the pleading "does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009). In May 2020, the Texas Supreme Court recognized an exception that "a court may consider extrinsic evidence

regarding whether the insured and a third party suing the insured colluded to make false representations of fact in that suit for the purpose of securing a defense and coverage where they would not otherwise exist." *Avalos*, 2020 WL 2089752, at *5.

## I.   THERE IS NO "PROPERTY DAMAGE."

ETOPSI and McBride, as the parties seeking coverage, carry the burden of proving that there is "property damage" under the Policy's Insuring Agreement. *Nat. Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008) (applying Texas law). McBride's amended petition describes faulty work that needs to be corrected. As for McBride's formulaic recitations of the phrases "property damage," "tangible property," and "loss of use," they are insufficient to explain how any of McBride's other property was damaged. Kinsale is accordingly entitled to summary judgment

### A.  McBride's Petition Seeks Purely Economic Damages.

For coverage to exist, the Policy requires "property damage," which is defined as: (1) "physical injury to tangible property," or (2) "loss of use of tangible property that is not physically injured." (Ex. E, Pgs. 6, 20.) Otherwise, there is no coverage.

Regarding the first component of this definition, courts interpreting Texas law have routinely held that analogous claims for fault work do not amount to "property damage." *See PPI Technology Services, LP v. Liberty Mut. Ins. Co.*, 515 F. App'x 310, 314 (5th Cir. (Tx.) 2013) (**no property damage** in suit between well operator and consultant based on negligent drilling); *Cook v. Admiral Ins. Co.*, 2:09-cv-0109, 2010 WL 2605256, at *4 (N.D. Tex. June 29, 2010), *aff'd* 438 F. App'x 313 (5th Cir. 2011) (**no property damage** in suit between oil consultant and subcontractor where subcontractor merely removed too much casing resulting in a shallow well); *Mid-Continent Cas. v. Camaley Energy Co.*, 364 F. Supp. 2d 600, 605–06 (N.D. Tex.

2005) (despite including the phrase "property damage," complaint "**clearly did not allege physical injury to tangible property**"); *Lay v. Aetna Ins. Co.*, 599 S.W.2d 684 (Tex. Civ. App.—Austin 1980, *writ ref'd* n.r.e.) (**no property damage** in suit involving insured's failure to properly locate oil well on operator's leasehold). Distilled to their essences, all these cases stand for the general proposition that CGL policies do not cover economic damages from nonconforming or deficient work. *See, e.g., D.R. Horton, Inc. v. Am. Guar.*, 864 F. Supp. 2d 541, 555 (N.D. Tex. 2012) (**defective work itself does not constitute property damage**).

The decision by the Fifth Circuit in *PPI* is particularly instructive. There, the underlying petition alleged a drilling rig was placed in the wrong location. Although the petition generically alleged the insured "caused property damage to [claimant] as an owner in the property where the well was being drilled," including "physical injury to tangible property," the Fifth Circuit cogently reasoned that such a formulaic recitation of policy terms did not suffice. The Court understood that the petition made clear the real issue was the economic damages suffered for having to re-drill the well. The lesson from *PPI* is clear: the mere invocation of conclusory buzz words like "property damage" and "tangible property" do not create coverage. Rather, the petition must contain **factual allegations** of discernable property damage to satisfy the Insuring Agreement and trigger coverage. *See Century Sur. Co. v. Hardscape Const. Spec. Inc.*, 578 F.3d 262, 267 (5th Cir. 2009) (in assessing the defense obligation the court looks to "the substance of the cause of action and not necessarily the manner in which it was pleaded") (quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617-18 (Tex.1986)).[5]

---

[5] Regarding what constitutes "physical injury," the Supreme Court of Texas has stated "that the best reading of the standard-form CGL policy text is that physical injury requires tangible, manifest harm and does not result merely upon the installation of a defective component in a product or system." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 27 (Tex. 2015).

Here, just like in *PPI*, the Underlying Action does not assert any **factual allegations** identifying physical injury to "tangible property." McBride makes no attempt whatsoever to identify any "property damage." Rather, the operative pleading merely quotes the standardized language in the Kinsale policy using conclusory and fact-free "labels." (Ex. C, ¶5.) Moreover, also like *PPI*, the gravamen of the Underlying Action is purely economic damage. The lawsuit is over the economic loss for McBride's wasted drilling costs, repair expenses, and lost potential income. (*Id.*, ¶7.) Stated differently, McBride had to design and drill a new injection well that worked. This indisputable fact is corroborated by (1) McBride's concession in this action that its economic damages are exactly "$1,714,287.59" (Ex. F, Pg. 4), and (2) McBride's allegations in the original petition that merely seek reimbursement to "correct" ETOPSI's work (Ex. B, ¶5). Since these are economic damages—which do not constitute damage to "tangible property" under Texas law—there is simply no coverage under the Kinsale policy. *See PPI*, 515 F. App'x at 313 ("The allegations in the underlying lawsuits are either for economic damages, and thus not covered, or are legal conclusions, rather than factual allegations as required."). There is no coverage.

### B. There Was No "Loss of Use" Because the Injection Well Never Previously Existed.

McBride also cannot argue there is somehow "property damage" because McBride suffered the "loss of use" of existing property. This exact argument has been tried and failed. The *Cook* case, mentioned above, is virtually directly on point. There, the insured was hired to install a well casing and oversee the drilling project. The insured made a mistake counting the casing, and constructed a well that was too shallow. The well had to be "reworked" before it could be completed at the correct depth. The district court held that for there to be "loss of use of tangible

property," the tangible property (*i.e.*, the well) must have been in use prior to the damage. The district court explained:

> Here, a well completed at the specified depth is not "tangible property" simply because it did not exist at the time of the alleged breach … Damages for repairs or for the cost of getting what one desired, but did not receive, are not the same thing as damages for loss of use of the thing desired.

*Cook*, 2010 WL 2605256 at *3.

*Cook* compels the same result here. In a blatant ploy to create coverage, McBride's complaint merely pleads "loss of use," yet fails to offer any factual allegations of tangible property. As *Cook* cogently explained, "[d]amages for repairs or for the cost of getting what one desired, but did not receive, are not the same thing as damages for loss of use." *Id.* Ignoring the conclusory labels of "loss of use," as this Court must, there is simply no allegation of "property damage." Accordingly, Kinsale is entitled to summary judgment. *Merchants Fast Motor Lines*, 939 S.W.2d at 142 ("legal theories" and labels are insufficient to trigger coverage).

## II.    THE PROFESSIONAL LIABILITY EXCLUSION BARS COVERAGE.

Kinsale insured ETOPSI under a general liability policy, not a professional liability policy. The policy contains a prominent and broad Professional Liability Exclusion. In clear and easy-to-understand language—starting with an oversized and all-caps title—the Professional Liability Exclusion plainly provides there is no coverage for "professional liability, malpractice, errors, or omissions or acts of any type including rendering or failure to render any type of professional service." (Ex. F, Pg. 47.) In other words, the exclusion explains there is no coverage for claims flowing from "any type of professional service," without qualification and without limitation, and regardless of the particular theory of liability. In this case, all the allegations in the Underlying Action involve professional services provided by ETOPSI. Since the entire

lawsuit is based on ETOPSI's "rendering or failure to render any type of professional service," there is simply no coverage.

It probably goes without saying, but Professional Liability Exclusions like the one above serve the purpose of limiting a CGL carrier's exposure in an area in which the insured should have a separate Professional Liability policy.[6] Where, as here, a policy does not specifically define the term "professional services," the "relevant definition is that provided by Texas law." *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 425 (5th Cir. 2010) (applying Texas law). Texas courts apply a simple and straightforward definition of "professional services," as follows:

> The task must arise out of acts particular to the individual's specialized vocation, [and] ... it must be necessary for the professional to use his specialized knowledge or training.

*See Atl. Lloyd's Ins. Co. of Tex. v. Susman Godfrey, LLP.*, 982 S.W.2d 472, 476-77 (Tex. App.— Dallas 1998, *pet. denied*). Stated differently, a "professional service" is an act that "uses the inherent skills typified by the profession." *Id.* at 476.

### A.  McBride Admits it Sued ETOPSI for Professional Services.

Texas courts have repeatedly applied the Professional Liability Exclusion to oil and gas consulting services. For example, in *Admiral Ins. Co. v. Ford*, the Fifth Circuit applied a Professional Liability Exclusion under virtually identical facts. There, Ford, an "oil and gas consultant," obtained a CGL policy from Admiral. *See* 607 F.3d at 422. The Admiral policy

---

[6] *See Wilcox v. Am. Home Assur. Co.*, 900 F. Supp. 850, 859 (S.D. Tex. 1995) ("The State Farm and American Home policies could not be 'stacked' because they did not overlap. … The American Home policy is strictly a professional liability policy for errors and omissions … while the State Farm policy is a commercial general liability policy with an express exclusion for professional services[.]").

contained a Professional Liability Exclusion materially identical to the exclusion in this case.[7] Ford was hired by Exco "to create a drilling plan for an oil well and to consult and assist in the drilling of the well." *Id.* During drilling, the well blew out. Exco sued Ford claiming Ford failed "to perform adequate and competent drilling operations," including failures to "inspect the drill pipe," "instruct the mud logger," "look for and report metal shavings," and "use ditch magnets." *Id.* at 425. Exco also alleged that "not all operations of Ford's were professional in nature." *Id.* The insurer claimed that the Professional Liability Exclusion barred coverage, because the underlying conduct required Ford's "specialized or technical knowledge." The trial court denied Admiral's motion and ruled in favor of Ford.

On appeal, the Fifth Circuit reversed. The Court started by explaining that the duty to defend "must focus on the factual allegations in the underlying pleading rather than the legal theories alleged." *Id.* at 424. Consequently, the Court was "not bound by" Exco's "bald" and "self-serving" statement that "not all of Ford's operations were professional in nature." *Id.* at 425. Turning to the factual allegations, the Fifth Circuit held that the Professional Liability Exclusion easily applied, because the crux of "the underlying suit alleges the existence of and failure to fulfill a contract, the very subject of which was Ford's expertise in drilling operations." *Id.* at 426. Further, the insured could not sidestep the exclusion merely because "some breaching conduct was arguably non-technical in nature." *Id.* To adopt that interpretation would render the exclusion "almost meaningless," because "the implementation of a drilling plan invariably involves menial tasks." *Id.* In other words, Ford could not avoid the exclusion by fragmenting the "professional service" into granular bits.

---

[7] The relevant policy language provided that "this insurance does not apply to 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' due to the rendering or failure to render any professional service." *Id.* at 422.

Like the insured in *Ford*, McBride sued ETOPSI for failing to successfully implement and build a well. ETOPSI was hired as the "oil and gas industry consultant" and its operations included everything to construct the well: (1) "designing" the well, (2) "engaging" the drilling contractor, (3) "consulting" and "advising" the owner, (4) "deciding" the total depth, and (5) "controlling" drilling operations. (Ex. D, ¶5.) On 10/25/2017, ETOPSI "decided" that drilling was "complete." (*Id.*) McBride claims that ETOPSI "negligently" performed its "consulting services, product, and work," and "failed to fulfill the terms of the contract or agreement between [McBride] and [ETOPSI]." (*Id.*, ¶¶5,6.) In other words, the Underlying Action "alleges the existence of and failure to fulfill a contract, the very subject of which was" ETOPSI's expertise. *Ford*, 607 F.3d at 426. The Professional Liability Exclusion accordingly applies.

Other courts have sensibly agreed. In *Universal Cas. Co. v. A.E. Consultants, LLC*, No. H-08-849, 2009 WL 10697417 (S.D. Tex. June 26, 2009) (applying Texas law), a sister court in the Southern District of Texas interpreted a similar Professional Liability Exclusion under analogous facts. There, Universal issued a CGL policy to A.E. Consultants ("AEC"). Similar to the Kinsale policy, the Universal policy described AEC's operations as "Oil & Gas Consultant— No Hands on Work." *Id.*, at *1, *6. A well operator, Block T, retained AEC as the industry consultant to build a well. According to operative pleading, AEC was required to "measure and count" casing joints, "supervise" the placement of casing joints in the well hole, and "submit" a pipe tally. *Id.* Block T alleged that AEC erroneously counted the number of joints, resulting in casing that was cemented 400 feet above the well's pay zone. Block T sued AEC for "negligently measuring and tallying the casing joints," which resulted in "permanent damage to the well." *Id.* at *5. Universal denied coverage under a similarly worded Professional Liability

Exclusion, which barred coverage for "the rendering or failure to render any professional services." *Id.* at *4, *7.

On cross-motions for summary judgment, the court held that the exclusion applied. Like McBride will probably argue here, AEC/Block T attempted to avoid the exclusion by downplaying the tasks as requiring "no specialized training beyond 'grade school.'" *Id.* at *5. But, the court was not persuaded. First, the court explained that "AEC was not simply required to count the number of casing joints." Rather, the allegations described several tasks— measurement, supervision, and reporting—all of which were "particular to AEC's specialized vocation as an oil and gas consultant." *Id.* at *6. Moreover, the court found it "instructive" that Block T hired AEC to perform the work that it now claimed was defective: "If, as [Block T/AEC] contend, the acts AEC performed were simply ordinary tasks, then there would have been little need for Block T, the Well's operator and drilling contractor, to hire an outside oil and gas consulting firm." *Id.* Since the alleged negligence forming the basis of the suit "involves oil and gas consulting," the Professional Liability Exclusions eliminated coverage entirely.

The *Ford* and *Universal* decisions are hardly unique. Numerous other courts interpreting Texas law have applied the Professional Liability Exclusion in the context of oil and gas services. *See CBX Resources, LLC v. Ace Am. Ins. Co.*, 282 F. Supp. 3d 948, 962-64 (W.D. Tex. 2017) (**no coverage** under Professional Liability Exclusion for insured's oil drilling services, including construction, surface casing, and supervision operations); *Nicklos Drilling Co. v. Ace American Ins. Co.*, No. V-14-021, 2014 WL 6606575, at *3 (S.D. Tex. Nov. 5, 2014) (**no coverage** under Professional Liability Exclusion for insured's oil drilling services, including construction and monitoring operations); *Utica Lloyd's of Texas v. Sitech Engineering Corp.*, 38 S.W.3d 260, 264 (Tex. App.—Texarkana 2001) (**no coverage** under Professional Liability

Exclusion for insured's excavation services, including inspection, design, and supervision operations).

### B.  ETOPSI Provided McBride with Professional Services.

In this case, the allegations in the Underlying Action are simple and straightforward. McBride alleges ETOPSI was the "oil and gas industry consultant" for McBride #1. (Ex. D, ¶5.) ETOPSI "designed" the well, "engaged" the drilling contractor, "consulted" and "advised" the owner, "decided" the hole depth and casing, and "control[led]" the drilling operations. (*Id.*) Further, on 10/25/2017, ETOPSI "decided" that the drilling on the well was complete. (*Id.*) Thus, all of the factual allegations "arise out of acts particular to" ETOPSI's "specialized vocation" as an "oil industry consultant." *Ford*, 607 F.3d at 423. The allegations here are analogous to the "inspect," "instruct," "look for," "report," and "use" allegations in *Ford*, as well as the "offload," "measure," "count," "supervise," and "submit" allegations in *Universal*. For the same reason that the Professional Liability Exclusion applied there, it similarly precludes coverage here.

Additionally, all the alleged tasks actually require ETOPSI's "specialized knowledge or training." It is common sense that ordinary laypersons cannot "design," "engage," "consult," "advise," "decide," or "control" any activity in the oil drilling and oil consulting industry. Rather, these operations require considerable "specialized knowledge" in oil and gas consulting, including knowledge in geology, geophysics, well construction, project management, and risk analysis. Indeed, if "the acts [ETOPSI] performed were simply ordinary tasks, then there would have been little need for [McBride] … to hire an outside oil and gas consulting firm like [ETOPSI]." *Universal*, 2009 WL 10697417, at *6. Accordingly, the Professional Liability Exclusion applies.

Moreover, all the factual allegations that form the basis of the Underlying Action directly involve oil consulting services. ***McBride admits "ETOPSI provided McBride with professional services" as alleged in the Underlying Action.*** (DE 12, ¶12.) That concession alone should be dispositive, since McBride is the master of its theory of liability and controls its pleading.

The allegations also make clear that the claims arose out ETOPSI's professional services. McBride claims that ETOPSI's "consulting services, product, and work" were negligent, and the negligent services breached a "contract," "agreement," or "warranty." (Ex. D, ¶5.) Nowhere in the five-page petition does McBride seek damages for any wrongdoing unrelated to ETOPSI's specific consulting expertise. Regardless, the Fifth Circuit's published decision instructs that even if some conduct could conceivably qualify as "non-technical in nature," the Professional Liability Exclusion nonetheless applies. *Ford*, 607 F.3d at 423 ("the implementation of a drilling plan invariably involves menial tasks").

 Finally, the above conclusions are directly supported by Kinsale's petroleum engineering expert, J. Daniel Arthur, P.E. According to Mr. Arthur, "oil and gas consultants offering and performing these type of professional services are highly specialized, having highly technical skills, college degrees, applicable training, and significant specialized experience." (Ex. H, Pgs. 2-3, ¶6.) Mr. Arthur concluded that the allegations against ETOPSI in the Underlying Action arise of acts particular to oil consultation services. For instance, "designing an injection well" requires "highly specialized professional skills, knowledge, and experience." (*Id.*, ¶8.) Moreover, "engaging a drilling contractor" requires significant knowledge of the oil industry and considerable expertise, including "an 'in depth' understanding of petroleum engineering, geology, geophysics, injection reservoir analysis, expertise/experience with the Underground Injection Control Program, project and contract management, and risk analysis." (*Id.*, ¶9.) Last,

services like "decisions, advice, and consultation" require individuals "with specialized vocational/professional backgrounds having specialized knowledge and training." (*Id.*, ¶10.) In short, Mr. Arthur agrees that ETOPSI's services arise out of acts particular to oil consulting services, and all of the alleged acts require ETOPSI's "specialized skill and knowledge." (*Id.*, ¶11.)

Kinsale is entitled to summary judgment.

## III.   THE POLICY'S J.(5) AND J.(6) EXCLUSION BAR COVERAGE.

There is also no coverage under the policy's j.(5) and j.(6) "business risk" exclusions. These types of exclusions preclude "coverage for certain risks relating to the repair or replacement of the insured's faulty work or products or defects in the insured's work or product itself." *Dallas Nat. Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 222 (Tex. App.—Dallas 2015).[8] These exclusions "are intended to provide coverage for tort liability, not for the contractual liability of the insured for loss that occurs because the product or completed work was not that for which the other party bargained." *Indian Harbor Ins. Co. v. KB Lone Star, Inc.*, H-11-CV-1846, 2012 WL 3866858 (S.D. Tex. Sept. 5, 2012) (citing *T.C. Bateson Const. Co. v. Lumbermens Mut. Cas. Co.*, 784 S.W.2d 692, 694-95 (Tex. App.—Houston [14th Dist.] 1989).

The j.(5) exclusion applies "[t]o that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." (Ex. E, Pg. 9.) Similarly, the j.(6) exclusion applies to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (*Id.*) These exclusions apply to

---

[8] *See also Nat'l Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 450 F. Supp. 2d 682, 696 (S.D. Tex. 2006) *aff'd sub nom.* 532 F.3d 398 (5th Cir. 2008) ("The purpose of a 'business risk' exclusion is to protect insurers from damages to an insured's product by his own hand, as this is typically considered a cost of doing business.") (citing *Comsys Info. Tech. Svcs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 196 (Tex. App.—Houston [14th Dist.] 2003)).

"circumstances where the contractor or subcontractors are currently working on the project." *See, e.g.*, *Jim Johnson Homes, Inc. v. Mid-Continent Cas. Co.*, 244 F. Supp. 2d 706, 719 (N.D. Tex. 2003) (citations and quotations omitted).

Several courts have applied these exclusions to identical well construction operations. For instance, in *Cook v. Admiral Ins. Co.*, 438 F. App'x 313, 318 (5th Cir. 2011) (applying Texas law), the Fifth Circuit held that a CGL insurer had no duty to defend an insured contractor who had been hired by an oil well owner to deliver and oversee installation of casing in an oil well. The Fifth Circuit explained that the "[p]lain language of exclusion j.(5) makes it applicable to property damage that 'arises out of' operations that take place while the insured is performing operations." *Id.* The appellate court then found that the exclusion was applicable because the underlying lawsuit arose from the fact that "[t]he well was completed to the incorrect depth … while [the insured] was 'delivering and overseeing the running of casing on [the] well.'" *Id.*

Even more recently, in 2017, a district court in the Western District of Texas applied the j.(5) exclusion to preclude damages for the total loss of a well that occurred during drilling operations. In *CBX Resources,  LLC v. Ace Am. Ins. Co.*, 282 F. Supp. 3d 948 (W.D. Tex. 2017), an insured drilling consultant "was contracted to perform work during, and to oversee, construction of the entire well." The insured's work caused the well casing to become fractured, plugged, and abandoned. In the subsequent suit against the insured, the plaintiff alleged damages for "drilling operations, surface casing, unrecovered production casing, the Well and the well bore, the oil and gas itself, and the lease." Construing the plain language of the policy, the court held that the "property damage alleged by CBX, including the physical injury to, and loss of use of, the Well falls within the 'property damage' exclusion in paragraph j.(5) and is excluded from coverage." *Id.* at 959.

Finally, in *Mid-Continent Cas. Co. v. Camaley Energy Co., Inc.*, 364 F. Supp. 2d 600 (N.D. Tex. 2005), the district court applied the j.(5) exclusion under analogous facts. There, the insured accidentally lost control of an oil well bore and deviated into another lease. The court held that because the alleged property damage occurred while the insureds were drilling on the plaintiff's lease, the damages fell squarely within the j.(5) exclusion. The court noted that the insureds were being sued by the owners of the neighboring property for property damage, then exclusion j.(5) would be inapplicable because the insureds were not performing work on their neighboring property. Because the insureds were being sued by the plaintiff leaseholders, for property damage inflicted on their own lease, the "damages [fell] squarely within exclusion 'j(5).'" *Id.* at 607.[9]

Applying the reasoned logic of all these cases here, exclusion j.(5) applies because: (1) the "property damage" occurred to real property where ETOPSI was performing operations (*i.e.*, constructing an injection well); and, (2) the alleged damage "arose out of" ETOPSI's operations. The factual allegations in the Underlying Action could not be any clearer. ETOPSI was hired as the "industry consultant" for completion of an "injection well." (Ex. D, ¶5; DE 5, ¶11.) ETOPSI designed the well, engaged the driller, decided the depth, set the casing, and decided when drilling was complete. (*Id.*) Thus, just like the insureds in *Cook* and *CBX Resources*, ETOPSI was responsible for the entire project. (*Id.*) Further, all the alleged damage occurred to real property where ETOPSI was performing operations and arose out of those operations. Aside

---

[9] *See also Admiral Ins. Co. v. Little Big Inch Pipeline Co., Inc.*, 523 F. Supp. 2d 524, 541 (W.D. Tex. 2007) (holding that "Exclusion j.(5) clearly applies to the damage caused by [the insured] excavating the gas lines, destroying the foundations and concrete slabs, and piling up the leftover debris [because] [s]uch damage occurred on the real property that [the insured] was working on"); *Houston Bldg. Serv., Inc. v. Am. Gen. Fire & Cas. Co.*, 799 S.W.2d 308, 311 (Tex.App—Houston [1st Dist.] 1990) (finding j.(5) exclusion precluded coverage for damage occurring while insured janitorial company was cleaning building because operations had not been completed).

from the well itself, McBride specifically alleges that ETOPSI's work damaged "the structures of the earth and prevent this wellbore from being used in the future." Accordingly, the allegations fall squarely within the plain terms of the j.(5) Damage to Property Exclusion.[10]

Last, the factual allegations unequivocally confirm that the damage occurred during the ongoing performance of ETOPSI's operations. ETOPSI was responsible for providing a functioning "injection well." (Ex. D, ¶5.) On 10/25/2017, ETOPSI decided "drilling … was complete." (*Id.*) For purposes of j.(5), the damage accordingly occurred on this date and while ETOPSI was performing operations. *See, e.g.*, *Cook* 438 F. App'x at 318 ("Here, the 'property damage,' *i.e.*, the completion of the well at an incorrect depth, undeniably *arose out of* [the insured]'s operations[.]") (emphasis in original). Even more, the operative petition alleges ETOPSI was performing operations *after* the drilling was complete. To be certain, the petition alleges that ETOPSI "caused various fluids, muds, and other substances to be *injected* into the wellbore," which reached near the "geologic formation." (Ex. D, ¶5.) Accordingly, the factual allegations trigger the exclusions. Kinsale is entitled to summary judgment.[11]

## IV.   BECAUSE KINSALE HAS NO DUTY TO DEFEND, THERE IS NO DUTY TO INDEMNIFY.

The same reasons that negate the duty to defend likewise negate any possibility there could ever be a duty to indemnify. Accordingly, Kinsale is entitled to a judgment that there is no duty to indemnify. *See Farmer Tex. Cnty Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997).

---

[10] It is well-settled that wells, including injection wells, constitute real property. *See*, *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 85 (Tex. App.–Houston [1st Dist.] 2003) (noting that "settled law recognize[es] that mineral wells constitute improvements to real property"); *Bosque Disposal Sys., LLC v. Parker Cnty. Appraisal Dist.*, 555 S.W.3d 92, 97 (Tex. 2018) (concluding that "disposal wells" are "real property" because they are improvements to land).

[11] For the sake of simplicity, Kinsale focused its analysis on exclusion j.(5). For all the reasons that the j.(5) exclusion applies, however, the j.(6) exclusion likewise applies. *Cook*, 438 F. App'x at 318 (applying j.(5) and j.(6) interchangeably under analogous facts).

## V.     THERE ARE NO APPLICABLE AFFIRMATIVE DEFENSES.

McBride raised <u>no</u> affirmative defenses. McBride's counterclaim only asserts that the exception to the j.(6) exclusion somehow creates coverage. (DE 5, Pg. 7.) This argument has no merit. It violates long standing Texas law that an exception to an exclusion does not "create" coverage, or otherwise nullify specific policy exclusions. *See, e.g.*, *United Nat. Ins. Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 453 (5th Cir. 2007) ("Motiva's reading of the United National [endorsement] would require this court to hold that an exception to an exclusion contained in an umbrella policy's [endorsement] can impliedly neutralize all other specific exclusions to coverage. We decline to reach this anomalous result.").[12]

ETOPSI asserted two affirmative defenses. (DE 6, Pg. 7.) The first is that ETOPSI believes the policy is ambiguous, but fails to explain why. ETOPSI's first affirmative defense fails. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations.").

ETOPSI's second affirmative defense is that Kinsale waived and is estopped regarding coverage for "Underground Resources and Equipment Hazard" ("UREH"). (DE 6, Pg. 7.) This affirmative fails for several reasons. First, "it is well-settled Texas law that doctrines of waiver and estoppel cannot be used to create insurance coverage where none exists under the terms of the policy." *Little Big Inch Pipeline*, 523 F. Supp. 2d at 543. Second, the UREH does not apply in the first place, since it only applies when there are factual allegations of "property damage." As discussed above, the underlying petition fails to assert any covered

---

[12] Further, the exception to the j.(6) exclusion provides that it does not apply to property damage "in the 'product-completed operations hazard.'" Here, ETOPSI's injection well never worked; accordingly, it does not fall within the "products-completed operations hazard." To the extent that it did work, the Policy's Your Work Exclusion (exclusion l.) precludes coverage. *See, e.g.*, *Wilshire Ins. Co. v. RJT Const., LLC*, 581 F.3d 222, 226 (5th Cir. 2009) ("The 'your work' exclusion prevents a CGL policy from morphing into a performance bond covering an insured's own work.").

"property damage." Accordingly, the UREH does not apply. Third, assuming "property damage" existed, the UREH is irrelevant. The UREH does not modify the insuring agreement, nor does it eliminate or modify any of the exclusions referenced above. Rather, the UREH performs two narrow functions: (1) it *reduces* the aggregate limit from $2 million to $1 million for certain claims involving underground resources; and, (2) it modifies the j.(4) exclusion, which only applies to "personal property." Neither of these issues are relevant here. The affirmative defense therefore totally fails.

## VI.   ETOPSI IS NOT ENTITLED TO DAMAGES UNDER CHAPTER 542.

Finally, ETOPSI pleads entitlement to damages under Chapter 542. (DE 6, Pgs. 11-12.) To bring a successful Chapter 542 claim, however, a plaintiff must establish that the insurer is "liable for the claim." Tex. Ins. Code § 542.060(a); *see also Weiser–Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 518 (5th Cir. 2015). Further, an insurer that has not breached the policy generally cannot be liable for Insurance Code violations. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 99 F.3d 695, 709 (5th Cir. 1996) (citing *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995)). Because Kinsale never had a duty to defend, it did not breach the Policy and cannot be liable under the statute.

## CONCLUSION

ETOPSI failed to design and deliver a functioning injection well. McBride had to incur the expense of designing and implementing a second injection well that would work. For all the reasons detailed above, there is no coverage under the policy. Accordingly, Kinsale respectfully requests that the Court enter summary judgment in its favor.

Respectfully submitted,

/s/ ANDRES CORDOVA
**ANDRES CORDOVA**
Florida Bar No. 0118147
andres.cordova@clydeco.us
*Admitted Pro Hac Vice*

Clyde & Co US LLP
1221 Brickell Avenue
Suite 1600
Miami, Florida

**ATTORNEYS FOR PLAINTIFF**
**KINSALE INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document has been served on all counsel of record via the CM/ECF system, on May 18, 2020.

/s/ANDRES CORDOVA
ANDRES CORDOVA